Richard D. THIELMAN, Plaintiff,

v.

Joseph LEEAN, Secretary of the Department of Health and Family Services; Laura Flood, Deputy Administrator and Interim Director of the Division of Care and Treatment Facilities of the Department of Health and Family Services; Jerry Bednarowski, Interim Clinical Director SVP Treatment Program, Department of Health and Family Services; Diane Fergot, Interim Clinical Director SVP Treatment Program, Department of Health and Family Services; Margaret Alexander, Interim Clinical Director SVP Treatment Program, Department of Health and Family Services; Anna Salter, Interim Clinical Director SVP Treatment Program, Department of Health and Family Services; Byran Bartow, Director of the Wisconsin Resource Center; Jon Litscher, Secretary of the Department of Corrections; James Doyle, Wisconsin Attorney General, Defendants.

No. 99–C–580–C.

United States District Court, W.D. Wisconsin.

April 9, 2001.

Mary E. Kennelly, Fox & Fox, S.C., Madison, WI, for plaintiff.

Joely Urdan, Assist. Atty. Gen., Madison, WI, for defendants.

## OPINION AND ORDER

CRABB, District Judge.

Plaintiff ·Richard Thielman, a person committed involuntarily as a sexually violent person under Chapter 980 of the Wisconsin Statutes, brings this action for declaratory and injunctive relief under 42 U.S.C. § 1983 against various employees of the Wisconsin Resource Center and the Department of Health and Family Services in their official capacities. Plaintiff contends that defendants are 1) denying his rights to due process and equal protection under the Fourteenth Amendment by placing him in full restraints each time he is transported to and from the facility, requiring him to wear state-issued clothing when he leaves his assigned living unit, searching his room on a random basis and requiring him to have contact with prisoners in residential units and in the patient dining area; 2) depriving him of his right to adequate mental health treatment as guaranteed to him by the due process clause of the Fourteenth Amendment; and 3) violating his Fifth Amendment privilege against self-incrimination by requiring him to provide a full disclosure of his sexual offenses as a condition of his treatment.

Before the court are the parties' cross motions for summary judgment. Plaintiff has moved for summary judgment on his second and third claims and on his claim that the Wisconsin Resource Center's policy of transporting all Chapter 980 patients in full restraints violates his rights to due process and equal protection. Defendants have moved for summary judgment on the merits of all of plaintiff's claims. Also, defendants contend that defendants Jon Litscher, Joseph Leeann and James Doyle are not proper parties to this action because they lack any personal involvement in the alleged unconstitutional actions.

Defendants' motion for summary judgment will be granted in all respects. Because plaintiff concedes that defendants Litscher, Leeann and Doyle are not proper parties to this action, these defendants will be dismissed. As for the merits of plain-

tiff's claims, plaintiff has failed to adduce evidence to show that defendants have not exercised professional judgment in enforcing the transportation policy or that no rational basis exists for distinguishing Chapter 980 patients from other civilly committed patients. In addition, he has failed to adduce any evidence from which a trier of fact could conclude that defendants have not exercised their professional judgment in developing and administering the sex offender treatment program at the Wisconsin Resource Center. Finally, because plaintiff has passed the disclosure component of the treatment program, his Fifth Amendment claim is moot.

To prevail on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1412 (7th Cir.1989). When the moving party succeeds in showing the absence of a genuine issue as to any material fact, the opposing party must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991). The opposing party cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

■■■■ Before setting out the facts it is important to clarify the nature and scope of plaintiff's claims. Plaintiff is not seeking damages for past injuries but is seeking declaratory and injunctive relief to pre-

vent defendants from continuing to engage in conduct that he contends violates his constitutional rights. This means that in order to satisfy Article III's "case or controversy" requirement, he must show either that the injuries he complains of are continuing or that he is under the immediate threat that the injuries complained of will be repeated. *See Sierakowski v. Ryan*, 223 F.3d 440, 444 (7th Cir.2000) ("[I]n order to invoke Article III jurisdiction a plaintiff in search of prospective equitable relief must show a significant likelihood and immediacy of sustaining some direct injury."). As the Supreme Court explained in *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *Id.*, at 102. Although past wrongs may be evidence that future violations are likely to occur, they must be accompanied by other evidence to show a sufficient likelihood that the plaintiff will be wronged later in a similar way. *See Sierakowski*, 223 F.3d at 444–45. This rule applies to claims for declaratory as well as injunctive relief. *See Robinson v. City of Chicago*, 868 F.2d 959, 966 n. 5 (7th Cir.1989)("The declaratory relief statute is not an independent basis of jurisdiction and requires an 'actual controversy'.").

When plaintiff's proposed findings of fact are sifted through this legal sieve, it becomes apparent that many of his facts are immaterial because they relate solely to past wrongs that are not likely to be repeated. For example, plaintiff complains that defendants failed to enroll him in any formal sex offender treatment from June 1998 to January 1999, yet he concedes that he has been enrolled in sex offender treatment almost continuously since that time and presents no evidence to

suggest that his treatment will not continue in the future. Also, plaintiff complains that treatment staff have deviated on various occasions from the Wisconsin Resource Center's internal policies regarding patient care, yet he has not alleged how any of these deviations were harmful to him in the past, much less that they are likely to harm him in the future. For example, plaintiff has complained that his April 22, 1999 care plan was deficient because it lacked an Axis II diagnosis, yet he has adduced no evidence to show what that diagnosis should have been or how the omission of such a diagnosis will affect his future treatment. He complains that no psychologist reviewed his care plan of March 27, 2000, yet he does not contend that this omission had or will have any affect on his treatment.

■ From my review of the record, I conclude that of all the alleged wrongs of which plaintiff complains with respect to the adequacy of his treatment, at the time plaintiff submitted his proposed findings of fact there were only two that could arguably have had any continuing, adverse effects on him: 1) his claim that he is not in treatment for a sufficient amount of time each week and 2) the requirement that patients must provide a complete disclosure of all sexual assaults, both charged and uncharged, before they are eligible to participate in the CORE treatment program or be considered for supervised release. With respect to this latter claim, plaintiff averred that he had not passed the treatment program's disclosure component (then called Gateway) because he had failed to disclose the facts related to his index offense and an uncharged sexual assault out of fear that he would expose himself to criminal charges. Plaintiff alleged that the disclosure requirement was having an adverse effect on him because it presented him with two unacceptable options: either remain in Gateway indefinitely or waive his Fifth Amendment privilege.

■ This claim is now moot. A claim becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome. *Murphy v. Hunt*, 455 U.S. 478, 481, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982). In short, "mootness [is] the 'doctrine of standing in a time frame. The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence.'" *United States Parole Commission v. Geraghty*, 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) (quoting Henry Monaghan, *Constitutional Adjudication: The Who and When*, 82 Yale L.J. 1363, 1384 (1973)). An evaluation report submitted by defendants after plaintiff filed his initial proposed findings of fact indicates that plaintiff passed the Gateway program on February 16, 2001 and has been referred to the Core program. *See* Third Affid. of Diane Fergot, dkt. # 161, exh. TT (under seal). Plaintiff completed the three required assignments of the Gateway treatment group, including presentation of his index offense, his timeline and his complete sexual history. Although the report indicates that group facilitators were not satisfied completely with plaintiff's honesty and that they intend to "address some of these issues" in the CORE program, there is no longer any basis for plaintiff's claim that defendants are penalizing him for failing to disclose his complete sexual history by preventing him from progressing to the CORE treatment program.

■ Courts recognize exceptions to the general rule that a case must present a live controversy in cases that are "capable of repetition, yet evading review." This exception, however, is limited to those situations in which 1) the challenged action is too short in duration to be fully litigated prior to its cessation and 2) a reasonable expectation exists that the same parties

would be subjected to the same action again. *Murphy*, 455 U.S. at 482, 102 S.Ct. 1181. Although the evaluation report indicates that plaintiff's group facilitators may continue to press plaintiff to disclose more facts concerning his sexual history, there is insufficient evidence in the record from which I can conclude that plaintiff will be faced with the same Hobson's choice that he alleged in this lawsuit. Apparently, plaintiff has disclosed enough information about his index offense and uncharged sexual offenses to satisfy his group facilitators, so it is doubtful that he could still show that he faces any real threat of self-incrimination. Moreover, there is no evidence in the record regarding the requirements of the CORE program. Accordingly, a live controversy no longer exists with respect to plaintiff's Fifth Amendment claim.

The only claims that present an actual case or controversy warranting injunctive relief are plaintiff's claims that defendants are violating his rights to due process and equal protection by subjecting him to various punitive conditions, including placing him in full restraints each time he is transported to or from the facility, and his claim that defendants are violating his right to substantive due process by failing to provide him with an adequate amount of sex offender treatment. Plaintiff's remaining claims will be dismissed for lack of standing under Article III.

For the purposes of deciding the motions for summary judgment, I find from the parties' proposed findings that there is no genuine dispute with respect to the following material facts.

### UNDISPUTED FACTS

### I. THE PARTIES

In April 1996, plaintiff Richard Thielman was adjudicated to be a sexually violent person under Wisconsin's sexual predator statute, Wis. Stat. chapter 980. Section 980.01(7) defines a "sexually violent person" in part as "a person who has been convicted of a sexually violent offense … and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." Pursuant to § 980.06, plaintiff was committed involuntarily to the Department of Health and Family Services "for control, care and treatment until such time as [he] is no longer a sexually violent person." On June 30, 1998, he was admitted to the Wisconsin Resource Center, where he continues to be a patient.

Defendant Laura Flood is Deputy Administrator of the Department of Health and Family Services. Defendant Byran Bartow is Director of the Wisconsin Resource Center. Defendants Diane Fergot, Jerry Bednarowski, Margaret Alexander and Anna Salter constitute a committee responsible for patient treatment, including the Sexually Violent Persons Treatment Program at the Wisconsin Resource Center. Defendant Fergot is a Unit Manager. Defendant Bednarowski is the institution's Education Director. Defendant Alexander is a psychologist who is employed full time at Oshkosh Correctional Institution. Defendant Salter is a psychologist in private practice who works as a consultant for the Department of Corrections. Defendants Alexander and Salter provide consulting services for clinical issues that may arise in the implementation of the Sexually Violent Persons program.

### II. CONDITIONS OF PLAINTIFF'S CONFINEMENT AT THE WISCONSIN RESOURCE CENTER

The Wisconsin Resource Center is a secure mental health facility operated by the Department of Health and Family Services. It houses both Department of Corrections inmates and patients committed

under Chapter 980. Although the institution attempts to keep inmates separate from patients, some interaction occurs between patients and inmates. For example, patients and inmates sometimes mingle in the hallways when patients travel within the institution to get their mail or to attend a treatment group. Also, inmates work in the library and patient cafeteria. Prisoners do not reside on patient units, although there may have been one patient who was serving a dual commitment (to the Department of Corrections and to the Department of Health and Family Services under Chapter 980) that lived on plaintiff's unit.

Before housing Chapter 980 patients, the Wisconsin Resource Center housed only Department of Corrections inmates and hired inmates to perform tasks that institution staff did not perform. After the Wisconsin Resource Center began housing Chapter 980 patients, the institution hired patients to be compensated workers. However, the institution's ability to add patients to its non-staff workforce has been limited by budgetary constraints because patients must be paid minimum wage, whereas inmates may be paid between 17 and 47 cents an hour. In spite of these budgetary constraints, the institution has attempted to employ patient workers on patient units. For example, in the past the institution employed only inmates to work in the patient cafeteria, but it now employs inmates for the lunch shift only and patients work the breakfast and dinner shifts.

The Wisconsin Resource Center has certain policies that it applies to Chapter 980 patients. When Chapter 980 patients are transported to or from the facility, they are placed in full restraints consisting of handcuffs, a waist belt and leg irons. Under this policy, institution staff transport Chapter 980 patients in full restraints even in the absence of any emergency situation,

therapeutic reason or recent history of physical aggression on the part of the patient, although greater or lesser restraints may be applied on a case-by-case basis. Patients committed involuntarily to other state psychiatric institutions under Chapter 51 are not subject to this blanket policy but are restrained during transport on a case-by-case basis.

From June 30, 1998 to September 25, 2000, plaintiff was transported out of the institution on more than 60 occasions for medical treatment. Each time, he was placed in full restraints pursuant to the transport policy. On no occasion did institution staff make an individualized determination that plaintiff posed a safety or security risk during transportation.

At least six cases of battery to staff and other patients by Chapter 980 patients have been referred for prosecution since 1998. In addition, one patient escaped from custody during transport out of the institution in 1998 and abducted a child. Also, one case of arson and two cases of criminal damage to property were referred for prosecution, although it is unclear when these incidents occurred.

Chapter 980 patients, including plaintiff, are required to wear state-issued clothing when they leave their assigned living units. The purpose of this policy is twofold. First, the policy protects the institution's interest in preventing escapes by allowing staff to distinguish staff from patients, which is more difficult if patients are permitted to wear their own clothing when out of their assigned living unit. Second, requiring patients to wear inmate clothing in shared areas reduces tension between inmates and patients.

The institution also has a policy authorizing random searches of patient rooms. The purpose of these searches is to protect institution, staff and public safety and to reinforce treatment goals by preventing

the possession of drugs, weapons and other contraband by patients.

## III. PLAINTIFF'S TREATMENT AT THE WISCONSIN RESOURCE CENTER

The treatment of persons committed indefinitely as sexually violent persons is an evolving field. These programs have been operating in the United States for only a few years and involve a more concentrated group of high-risk sex offenders than are usually found in most correctional treatment programs. For that reason, treatment standards, techniques and approaches are in a state of continuing development as efforts are made to improve the efficacy of treatment of this group of offenders. At present, there is no group in the United States that is charged with accrediting civilly committed sex offender treatment programs.

The Wisconsin Resource Center offers patients the opportunity to participate in sex offender treatment. With the exception of a few months during which the institution was revising its program, plaintiff has been enrolled continuously in the Sexually Violent Persons Treatment Program since January 1999. Plaintiff's sex offender treatment has consisted of attending groups for one and a half to three hours a week and completing group assignments on his own time. His care and progress in treatment are overseen by a multi-disciplinary treatment team.

## OPINION

## I. THE WISCONSIN RESOURCE CENTER'S TRANSPORTATION POLICY

Plaintiff contends that the institution's policy of transporting all Chapter 980 patients in full restraints violates his rights to due process and equal protection under the Fourteenth Amendment. Both sides have moved for summary judgment on this claim.

### A. Substantive Due Process

#### 1. Legal standard

The due process clause contains a substantive component that bars certain arbitrary, wrongful government actions "regardless of the fairness of the procedures used to implement them." *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). When a state deprives a person of his ability to care for himself by committing him involuntarily, it assumes an obligation to provide some minimum level of well-being and safety. *See DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 198–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court held that under the due process clause of the Fourteenth Amendment, an institutionalized person in state custody "enjoys constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." *Id.*, 457 U.S. at 324, 102 S.Ct. 2452. Moreover, due process requires that the conditions and duration of confinement relate reasonably to the purpose for which persons are committed. *See Seling v. Young*, 531 U.S. 250, 121 S.Ct. 727, 736, 148 L.Ed.2d 734 (2001) (citations omitted).

■ Relying on *Youngberg*, plaintiff contends that the transportation policy violates his substantive due process right to freedom from bodily restraint. In *Youngberg*, the Court observed that "[l]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Youngberg*, 457 U.S. at 316, 102 S.Ct. 2452 (quoting *Green-*

*holtz v. Nebraska Penal Inmates,* 442 U.S. 1, 18, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (Powell, J., concurring in part and dissenting in part)). Although an individual committed involuntarily to a mental institution is though entitled to "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish," *id.* at 322, 102 S.Ct. 2452, he does not enjoy an absolute right to freedom of bodily movement. "In operating [a mental health facility], there are occasions in which it is necessary for the State to restrain the movement of residents—for example, to protect them as well as others from violence." *Id.* at 320, 102 S.Ct. 2452. Under a substantive due process analysis, the question "is not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint ... is such as to violate due process." *Id.,* 457 U.S. at 320, 102 S.Ct. 2452. Answering this question requires courts to balance the plaintiff's liberty interest against the institution's interest in ensuring safety and promoting treatment.

In *Youngberg,* the Court rejected the Third Circuit's conclusion that because physical restraint "raises a presumption of a punitive sanction," proper balancing of the competing interests involved required the state to demonstrate a "compelling necessity" justifying the use of the restraints. *Id.* at 313, 322, 102 S.Ct. 2452. Concluding that the Third Circuit's test would "place an undue burden on the administration of institutions such as Pennhurst and also would restrict unnecessarily the exercise of professional judgment as to the needs of residents," the Court held that the "professional judgment" standard was the appropriate test for balancing the individual's and the state's interests and for insuring that "interference by the federal judiciary with the internal operations of [state] institutions" is "minimized." *Id.* at 322, 102 S.Ct. 2452. The Court explained that when evaluating whether an involuntarily committed person's rights have been violated, courts must show deference to the decisions of professionals:

> [T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

457 U.S. at 323, 102 S.Ct. 2452 (footnote omitted). *See also Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (state could impose restrictions on pretrial detainees' confinement so long as restrictions were related reasonably to legitimate government objectives and not tantamount to punishment; court must defer to professional expertise of administrators when evaluating relationship between challenged restriction and government's interest).

The Court explained that by "professional" decisionmaker, it meant

> a person competent, whether by education, training or experience, to make the particular decision at issue. Long-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded. Of course, day-to-day decisions regarding care—including decisions that must be made without delay—necessarily will be made in many instances by employees without formal training but who are subject to the supervision of qualified persons.

457 U.S. at 323 n. 30, 102 S.Ct. 2452.

Although the parties have analyzed the transportation policy under *Youngberg's* professional judgment standard, this test

does not apply perfectly to a situation such as this in which the plaintiff is challenging an across-the-board policy rather than an individual decision regarding the use of restraints; indeed, the nature of a "blanket" policy is such that it *removes* the need for decisionmaking on a case-by-case basis. In this respect, the test articulated by the Supreme Court in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447, may offer a better method for assessing the constitutionality of the Wisconsin Resource Center's transport policy. In *Bell,* the Court held that a state may detain a pretrial detainee in order to insure his presence at trial and may subject him to the restrictions and conditions of the detention facility "so long as those restrictions do not amount to punishment, or otherwise violate the Constitution." *Id.* at 536–37, 99 S.Ct. 1861. To distinguish between an impermissible punitive measure and a permissible condition of confinement, a court must decide "whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538, 99 S.Ct. 1861. "Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it." *Id.* (citations and internal quotations omitted); *see also Rapier v. Harris,* 172 F.3d 999, 1005 (7th Cir.1999).

### 2. *Applying the standard*

In the end, whether one applies *Youngberg*'s professional judgment standard or *Bell*'s punitive versus non-punitive distinction, the outcome is the same. Under either approach, the court must defer to the professional expertise of the institution's administrators when evaluating the relationship between the challenged condi-

tion and the government's interest. *See Youngberg,* 457 U.S. at 322–23, 102 S.Ct. 2452 ("there certainly is no reason to think judges or juries are better qualified than appropriate professionals in making decisions"); *Bell,* 441 U.S. at 548, 561–62, 99 S.Ct. 1861 (plaintiff must identify "substantial evidence in the record to indicate that the officials have exaggerated their response" to genuine security concerns in order to overcome "heavy burden" to show that restriction is excessive).

Defendants contend that the institution's policy of transporting all Chapter 980 patients in full restraints is justified by security concerns. Specifically, the Wisconsin Resource Center's security director, Mario Canziani, has averred that the policy is supported by specific instances of aggression by Chapter 980 patients, including battery to staff and other patients. Also, Canziani averred that the policy is justified by the fact that Chapter 980 patients have been adjudicated dangerous and the term of their commitments are indefinite. Canziani averred that he exercises his professional judgment in managing institution safety and enforcing security policies and procedures.

Plaintiff does not dispute that the concerns articulated by defendants are legitimate or that the transportation policy is not related to these concerns. Rather, plaintiff contends that the policy is punitive because it is excessive in relation to the purposes it is meant to serve. According to plaintiff, substantive due process requires the state to consider whether less restrictive alternatives are available before imposing full restraints. As evidence of the reasonableness of less restrictive alternatives, plaintiff points out that the Department of Corrections has developed a system for inmates that provides for various levels of restraint during transport

depending on the inmate's security classification.

Plaintiff may be correct that the institution could address its security interests with a more tailored policy, but that is not the test. Contrary to plaintiff's suggestion, nothing in *Youngberg* suggests that the choice made by the institution must have been the least restrictive alternative available. To the contrary, *Youngberg* admonishes judges to respect the choices made by professionals at state institutions. So long as that choice was made by a professional, it is presumptively valid even if it is not the best alternative. *See Collignon v. Milwaukee County*, 163 F.3d 982, 990 (7th Cir.1998) (mere disagreement about which of many professionally acceptable treatment plans should have been implemented does not make out substantive due process claim); *P.C. v. McLaughlin*, 913 F.2d 1033, 1043 (2d Cir.1990) ("The requirement that professional judgment be exercised is not an invitation to a court reviewing it to ascertain whether in fact the best course of action was taken.").

Plaintiff has not adduced a single piece of evidence to show that the Wisconsin Resource Center's transportation policy represents a substantial departure from accepted professional judgment, practice or standards or that it is so excessive in relation to the institution's security concerns as to be tantamount to punishment. The only "evidence" on which plaintiff relies is Wisconsin's patients' rights statute, Wis. Stat. § 51.61(1), and a 1996 Wisconsin Resource Center policy governing the transport of patients that the institution admits it does not follow. (Chapter 980 committed persons are defined as "patients" under Chapter 51, Wisconsin's Mental Health Act, and are entitled to the patients' rights enumerated in Wis. Stat. § 51.61. *See State v. Post*, 197 Wis.2d 279, 313, 541 N.W.2d 115, 126–27 (1995).) Specifically, § 51.61(1)(i) provides in part:

[Each patient shall] have a right to be free from physical restraint and isolation except for emergency situations or when isolation or restraint is part of a treatment program. Isolation or restraint may be used only when less restrictive measures are ineffective or not feasible and shall be used for the shortest time possible ... Patients who have a recent history of physical aggression may be restrained during transport to or from the facility ... Persons who are committed or transferred under 51.31(3) or 51.37 or under ch. 971 or 975 may be restrained for security reasons during transport to or from the facility.

Pursuant to this provision, the Wisconsin Resource Center adopted the following policy:

RESTRAINT DURING TRANSPORTATION. In accordance with § 51.61(1)(i), Wis. Stats.

1. Patients may be restrained during transport to or from the facility. The least restrictive restraint necessary to protect the patient and others should be used.

2. Use of restraint during transport shall be documented in the patient's treatment records and such documentation shall include the reason for use of such techniques.

According to plaintiff, these provisions indicate that a decision to restrain a patient must be made on a case-by-case basis and the restraint used must be the least amount necessary to protect the patient and others.

Putting aside for the moment the issue whether these authorities may give rise to a state-created liberty interest that is broader than that afforded by the due process clause, the law is well-settled that "[m]ere violation of a state statute does not infringe the federal Constitution." *Snowden v. Hughes*, 321 U.S. 1, 11, 64

S.Ct. 397, 88 L.Ed. 497 (1944). Plaintiff attempts to overcome this obstacle by dressing his argument in the verbiage of *Youngberg,* arguing that "[a] judgment which violates state law cannot be 'professional' or 'appropriate' under any standard." Brief in Support of Plt.'s Mot. for Sum. Judg., dkt. # 130, at 7. However, in the absence of any evidence that § 51.61(1)(i) or the institution's former patient transport policy reflects the *only* professionally accepted method by which institution staff may transport Chapter 980 patients while giving simultaneous protection to the state's interests in security, defendants' failure to follow state law or a less restrictive internal policy does not amount to a violation of the substantive component of the due process clause. As the Court of Appeals for the Seventh Circuit has explained, "[a] state ought to follow its law, but to treat a violation of state law as a violation of the Constitution is to make the federal government the enforcer of state law. State rather than federal courts are the appropriate institutions to enforce state rules." *Archie v. Racine,* 847 F.2d 1211, 1217 (7th Cir.1988) (en banc).

Plaintiff also argues that evidence of defendants' intent to punish him can be discerned from the fact that the transportation policy was promulgated by the Department of Corrections to address the transportation of maximum security inmates. Even if this assertion is properly supported by evidence in the record, it does not prove that the intent of the policy is to punish. Even in a prison setting, not every regulation that affects a prisoner negatively is applied with the intent to punish him. Moreover, although an involuntarily committed person is entitled to less restrictive conditions of confinement than a prisoner, this is a general rule: it does not mean that the state automatically violates the Constitution if it adopts a rule that it also happens to apply to prisoners.

A person committed under Chapter 980 has been found beyond a reasonable doubt to have committed a sexually violent offense and to be dangerous because he or she suffers from a mental disorder that makes it substantially probable that he or she will engage in acts of sexual violence. One of the purposes of Chapter 980 is to protect the community from these individuals. *See State v. Post,* 197 Wis.2d 279, 313, 541 N.W.2d 115, 126 (1995). A patient committed under Chapter 980 is confined for an indefinite term. Chapter 980 patients have committed various acts of aggression including battery to staff and other patients. Through its security director, the Wisconsin Resource Center has made a professional determination that because of these factors, all Chapter 980 patients present a security risk warranting the use of full restraints during transport. Plaintiff has failed to point to anything in the record from which a trier of fact could conclude that this policy is not related reasonably to the institution's interests in protecting the community or that it represents an exaggerated or unprofessional response to this interests. Accordingly, he has not established a violation of his substantive right to due process. Summary judgment will be granted to defendants on this claim.

### B. *Procedural Due Process*

As noted previously, mere violation of a state statute does not infringe the Federal Constitution. However, state law is not totally irrelevant to a due process clause analysis. The substantive rights provided by the Federal Constitution define only a minimum: state law may recognize liberty interests more extensive than those independently protected by the Federal Constitution. *Mills v. Rogers,* 457 U.S. 291, 300, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982). When the state grants such a liberty interest, it may take it away only if

the decision to do so is accompanied by the minimum procedural protections that are required by the Constitution. *See Vitek v. Jones,* 445 U.S. 480, 488, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). "Once state law defines the substance, constitutional law establishes the minimum procedures." *Archie,* 847 F.2d at 1217. "[T]he substantive issue involves a definition of th[e] protected constitutional interest, as well as identification of the conditions under which competing state interests might outweigh it. The procedural issue concerns the minimum procedures required by the Constitution for determining that the individual's liberty interest actually is outweighed in a particular instance." *Washington v. Harper,* 494 U.S. 210, 220, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (quoting *Mills,* 457 U.S. at 299, 102 S.Ct. 2442) (citations omitted).

To have a property or liberty interest in a state-conferred benefit or privilege, a person must have more than an abstract need for it; "he must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Property and liberty interests "are created and their dimensions are defined by existing rules or understandings ... that secure certain benefits and that support claims of entitlement to those benefits." *Id.* For a liberty interest to be created by statute or regulation, the statute or regulation must place "substantive limits on official discretion." *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983). That is, the statute or regulation must use "language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed absent specified substantive predicates." *Hewitt v. Helms,* 459 U.S. 460, 471–72, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). "[A] liberty interest is created only where the state regulation in question contains 'specific directives to the decision-maker that if the regulations' substantive predicates are present, a particular outcome must follow....' " *Russ v. Young,* 895 F.2d 1149, 1153 (7th Cir.1989) (quoting *Kentucky Department of Corrections v. Thompson,* 490 U.S. 454, 463, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)).

In *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Court rejected the *Hewitt* analysis in the context of prison regulations, holding that a state's prison regulation does not give rise to a protected liberty interest unless it involves an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484. The Court observed that *Hewitt*'s focus on the language of the regulation instead of the nature of the deprivation had produced at least two undesirable effects: it had created disincentives for states to codify prison management procedures and it had caused the federal courts to become micromanagers of the prison system. *Id.* at 482, 115 S.Ct. 2293. However, the Court limited its reasoning to prison regulations:

> [The search for negative implication from mandatory language] may be entirely sensible in the ordinary task of construing a statute defining rights and remedies available to the general public. It is a good deal less sensible in the case of a prison regulation primarily designed to guide correctional officials in the administration of a prison.

*Id.* at 481–82, 115 S.Ct. 2293. *See also Rapier v. Harris,* 172 F.3d 999, 1004–05 (7th Cir.1999) (holding that *Sandin*'s "atypical and significant hardship ..." test does not apply to pretrial detainees, but finding *Bell* test superior to *Hewitt* approach for examining prison regulation as applied to pretrial detainee). Here, the statutes in question were not promulgated to guide officials in administering a prison, but were designed to prescribe the rights

and remedies available to persons committed involuntarily under various commitment statutes. *Cf. Sandin*, 515 U.S. at 482, 115 S.Ct. 2293 ("[prison] regulations [are] not designed to confer rights on inmates"). In light of the nature of the regulations at issue, the *Hewitt* analysis is appropriate. *Accord Morgan v. Rabun*, 128 F.3d 694, 699 (8th Cir.1997) (*Hewitt*, not *Sandin*, applied to procedural due process claim involving Missouri's patients' rights statute).

Plaintiff argues that various state statutes grant him an entitlement to freedom from restraint during transport to and from the institution. In addition to § 51.61(1)(i), plaintiff refers to § 51.61(1)(e), which provides that "[E]ach patient shall have the right to least restrictive conditions necessary to achieve the purposes of admission, commitment or placement ... [.]" Also, § 980.06(2)(b) provides that upon commitment of a sexually violent person, "the [Department of Health and Family Services] shall arrange for control, care and treatment of the person in the least restrictive manner consistent with the requirements of the person." Finally, the Department of Health and Family Services has an administrative regulation providing that "[E]ach patient shall be provided the least restrictive treatment and conditions which allow the maximum amount of personal and physical freedom in accordance with § 51.61(1)(e), Stats." HFS 94.07(1), Wis. Admin. Code.[1]

None of these statutes, either individually or collectively, contains the sort of language that is required to create a protected liberty interest. Although all of these provisions have mandatory language suggestive of a statutory entitlement, they lack any substantive predicates to limit the discretion of institution administrators with respect to restraining patients during transport. Indeed, although the statutes confer a general right to the least restrictive conditions of confinement, their failure to specify any conditions in which restraints may *not* be applied can be viewed only as expanding rather than limiting the discretion of decisionmakers to decide when restraints are appropriate. For example, § 51.61(1)(i) provides that isolation or restraint may be used only when less restrictive measures are "ineffective" or "not feasible" but it does not define these terms, thus leaving it to the discretion of decision-makers to decide how best to comply with the statute. By conditioning the general right to the least restrictive conditions of confinement in this manner, the state has not created any protected liberty interest.

Moreover, even if these provisions could be read as entitling patients to an individualized assessment of the need for restraints, their failure to mandate any particular outcome if specific predicates are or are not found during that assessment defeats any claim of entitlement under the due process clause. At most, plaintiff has shown that he is entitled to a state-created *procedural* right in the form of an individualized risk assessment; however, it is well-settled that a procedural protection is not itself a liberty interest within the

---

1. Plaintiff also refers to a Wisconsin Attorney General Opinion, OAG 58–82 (Oct. 15, 1982), which he contends interpreted § 51.61 as requiring a case-by-case determination of the amount of restraint that is appropriate for each individual. However, the Attorney General was addressing the amount of restraint that could be used when transporting an individual who had not yet been committed involuntarily under Chapter 51. In concluding that a Chapter 51 "detainee" has the right to the least amount of restraint necessary, the Attorney General stated specifically that the source of this right was *"independent of sec. 51.61, Stats."* 1982 WL 188354, 1. Contrary to plaintiff's assertion, the Attorney General was not interpreting the patients' rights provision.

meaning of the Fourteenth Amendment. *See Shango v. Jurich*, 681 F.2d 1091, 1100 (7th Cir.1982) (procedural protections or the lack thereof do not determine whether a liberty right exists). Plaintiff's alleged right to an individualized assessment has substantive meaning only if he has a protected liberty interest in remaining free from restraints during transport. Since he does not, the fact that state statutes suggest that the need for restraints should be determined on a case-by-case basis cannot serve as a basis for his claim of being deprived of a protected liberty interest. *See Doe by Nelson v. Milwaukee County*, 903 F.2d 499, 502–03 (7th Cir.1990).

Admittedly, the language of Wisconsin's patients' rights statute and related provisions under Chapter 980 is similar to that found to give rise to a protected liberty interest in *Johnson v. Brelje*, 701 F.2d 1201 (7th Cir.1983), a case cited by plaintiff. In *Johnson*, the court determined that a protected liberty interest arose from a provision of the Illinois Mental Health and Developmental Disabilities Code which stated that patients "shall be provided with adequate and humane care and services in the least restrictive environment" and that this interest prohibited the state from automatically assigning all males found unfit to stand trial to its most secure mental health center. *Id.*, 701 F.2d at 1205. However, unlike the provision in *Johnson*, the statutory and administrative provisions cited above qualify the phrase "least restrictive environment," with phrases such as "necessary to achieve the purposes of admission, commitment or placement," "consistent with the requirements of the person" and "which allow the maximum amount of personal and physical freedom in accordance with § 51.61(1)(e), Stats." By qualifying the phrase "least restrictive environment" with such conditional language, the Wisconsin legislature has granted the relevant decision-makers an amount of discretion that was absent from the statute in *Johnson*. Accordingly, I conclude that *Johnson* is not controlling authority in this case.

In sum, although plaintiff may be able to establish that the Wisconsin Resource Center's policy of transporting Chapter 980 patients in full restraints violates his patient rights under state law, he does not have a state-created liberty interest that entitles him to procedural protections under the Due Process Clause.

### C. *Equal Protection*

■ Plaintiff next contends that the transportation policy violates his right to equal protection because patients committed under Chapter 51 are not routinely transported in full restraints. Specifically, plaintiff contends that because Wisconsin's patients' rights statute mandates the same treatment for all civilly committed patients to whom the statute applies, defendants may not "selectively enforce" the statute in such a way that allows Chapter 980 patients, as a class, to be treated differently from Chapter 51 patients. This is true, argues plaintiff, regardless whether defendants may have a rational basis for treating Chapter 980 patients differently from Chapter 51 patients when transporting them.

■ Again, plaintiff has attempted to manufacture a federal court action out of what is essentially a state law claim. Contrary to plaintiff's assertion, "state law does not define the equality or rationality guaranteed by the fourteenth amendment." *Stern v. Tarrant County Hospital Dist.*, 778 F.2d 1052, 1057 (5th Cir.1985). The Supreme Court made this principle clear in *Snowden v. Hughes*, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944), a case in which the plaintiff contended that a state election board violated state law when it failed to certify him as a nominee despite the fact that he had received the requisite number of votes and thereby denied him

equal protection under the Fourteenth Amendment. In rejecting plaintiff's claim, the Court stated:

> If the action of the Board is official action it is subject to constitutional infirmity to the same but no greater extent than if the action were taken by the state legislature. Its illegality under the state statute can neither add to nor subtract from its constitutional validity. Mere violation of a state statute does not infringe the federal Constitution. And state action, even though illegal under state law, can be no more and no less constitutional under the Fourteenth Amendment than if it were sanctioned by the state legislature. A state statute which provided that one nominee rather than two should be certified in a particular election district would not be unconstitutional on its face and would be open to attack only if it were shown, as it is not here, that the exclusion of one and the election of another were invidious and purposely discriminatory.

*Id.* at 11, 64 S.Ct. 397 (citations omitted).

In other words, if it is constitutional for the state legislature to write a statute that would permit the action taken by an administrative agency, then the agency's action is necessarily constitutional. Conversely, it should go without saying that state officials may not rely on the content of a state statute to protect them from "the federal consequences of their otherwise-unconstitutional conduct." *Archie,* 847 F.2d at 1217 n. 6. In this regard, defendants' contention that a statute passed recently by the Wisconsin legislature *allows* them to single out Chapter 980 patients for different treatment shares the same unsound footing as plaintiff's reliance on the patients' rights statute.

Simply put, the content of state law is irrelevant to the question whether the transportation policy violates the equal protection clause of the Federal Constitution. The question is whether the Wisconsin Resource Center's classification of Chapter 980 patients as requiring full restraints during transport is so invidious as to deny plaintiff the equal protection of the law.

Equal protection does not require that all persons be dealt with identically. *Baxstrom v. Herold,* 383 U.S. 107, 111, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966). What it does require is that legislative or administrative distinctions have some relevance to the purpose for which the classification is made. *Id.* Ordinarily, a properly enacted statute will survive an equal protection challenge if "the legislative classification ... bears a rational relation to some legitimate end." *Romer v. Evans,* 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). It is only if the statute either interferes with a fundamental right or discriminates against a suspect class that it will have to withstand strict scrutiny. *See Kadrmas v. Dickinson Public Schools,* 487 U.S. 450, 457–58, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988).

■ There is no dispute that Chapter 980 patients do not constitute a suspect class. *See City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 445–46, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (holding that mentally retarded do not constitute suspect class and stating in dicta that mentally ill are not suspect class). Plaintiff contends that the transport policy requires strict or at least immediate scrutiny because it interferes with his fundamental right to be free from bodily restraint. However, it is unnecessary to analyze this question in light of my conclusion that the policy of transporting Chapter 980 patients in full restraints does not violate any substantive right guaranteed by the Constitution. As the Court explained in *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980):

The guarantee of equal protection under the [Fourteenth] Amendment is not a source of substantive rights or liberties, but rather a right to be free from invidious discrimination in statutory classifications and other governmental activity. It is well settled that where a statutory classification does not itself impinge on a right or liberty protected by the Constitution, the validity of classification must be sustained unless "the classification rests on grounds wholly irrelevant to the achievement of [any legitimate governmental] objective."

*Id.* at 312, 100 S.Ct. 2671 (quoting *McGowan v. Maryland*, 366 U.S. 420, 425, 81 S.Ct. 1101 (1961)). *See also Shapiro v. Thompson*, 394 U.S. 618, 642, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (fundamental rights strand of equal protection jurisprudence recognizes established constitutional rights and makes certain that those rights receive "no less protection than the Constitution itself demands.")(Stewart, J., concurring). Thus, in *McRae*, the Court held it was unnecessary to analyze whether a law restricting federal funding for abortion infringed a fundamental right for equal protection purposes in light of its conclusion that the law violated no constitutionally protected right. *See McRae*, 448 U.S. at 312, 100 S.Ct. 2671.

Having already concluded that the transportation policy does not infringe plaintiff's substantive rights under the due process clause, I must consider whether "there is a rational relationship between the disparity of treatment and some legitimate government purpose." *Heller v. Doe by Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). In order to show that the transportation policy is irrational, the plaintiffs must " 'negative every conceivable basis which might support it,' ... whether or not the basis has a foundation in the record." *Id.* at 320–21, 113 S.Ct. 2637 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S.Ct.

1001, 35 L.Ed.2d 351 (1973)). However, "the relationship of the classification to its goal [must] not [be] so attenuated as to render the distinction arbitrary or irrational." *Nordlinger v. Hahn*, 505 U.S. 1, 11, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) (citing *Cleburne*, 473 U.S. at 446, 105 S.Ct. 3249).

As should be clear from the foregoing substantive due process analysis, plaintiff is unable to meet his heavy burden to show that the transportation policy is arbitrary or irrational. Plaintiff argues that it is irrational for defendants to rely on the purported "dangerousness" of Chapter 980 patients as justification for the policy because Chapter 980 patients are not the only involuntarily committed individuals to have been determined legally to be dangerous: Chapter 51 also requires the state to show that the individual is dangerous to himself or others before he may be committed involuntarily. *See* Wis. Stat. § 51.20(1)(a)2. However, even the Supreme Court has acknowledged that the state may distinguish between different types of involuntarily committed persons. *See Jones v. United States*, 463 U.S. 354, 366–68, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983) (insanity acquittees may be treated differently in some respects from persons subject to civil commitment); *Baxstrom*, 383 U.S. at 111, 86 S.Ct. 760 ("[c]lassification of mentally ill persons as either insane or dangerously insane of course may be a reasonable distinction for purposes of determining the type of custodial or medical care to be given"). There are sound reasons for administrators at the Wisconsin Resource Center to have concluded that persons committed as sexually violent present a greater escape risk than persons in the larger, more inclusive class of patients defined under Chapter 51. As noted previously, persons committed under Chapter 980 have been proven beyond a reasonable doubt to have a past history of sexually violent conduct and to be substan-

tially likely to reoffend if released, elements that the state need not prove with respect to other civil committees. Moreover, the term of a Chapter 980 commitment is indefinite. These factors provide a rational basis upon which the state may rely in treating Chapter 980 patients differently from other civilly committed patients when it transports them to and from the facility. The transportation policy does not violate plaintiff's right to equal protection.

## II. PLAINTIFF'S OTHER EQUAL PROTECTION CLAIMS

██ Defendants have moved for summary judgment on the various allegations of unequal treatment raised by plaintiff in paragraphs 26(a)-(h) of his fourth amended complaint. Plaintiff concedes that he was not subject to some of the conditions of which he complained. Thus, the only complaints in dispute are his complaint that Chapter 980 patients must wear state-issued clothing when they leave their assigned living unit, that Chapter 980 patients are subject to random room searches and that prisoners are allowed to work in the patient dining area and library. (There is no support in the record for plaintiff's suggestion that the institution has a "policy" whereby it allows "prisoners" to reside on patient units. Viewed in the light most favorable to plaintiff, the record indicates that one patient who may have been under a dual commitment to the Department of Corrections and the Department of Health and Family Services under Chapter 980 lived on plaintiff's unit. However, the record indicates that the individual was placed at the Wisconsin Resource Center pursuant to the Chapter 980 commitment. *See* Second Affid. of Sally Farley, dkt. # 164, exh. RR (under seal).) Plaintiff contends that these policies violate his state-law right to "use and wear his ... own clothing and personal articles" under Wis. Stat. § 51.61(1)(q) and his right

to a "humane psychological and physical environment" in a facility designed "to promote dignity and ensure privacy" under § 51.61(1)(m). As with his challenge to the transportation policy, plaintiff contends that by denying these rights only to Chapter 980 and not all civilly committed patients, defendants are violating his right to equal protection.

As should be plain from the preceding section, plaintiff may not rely on state law as the foundation for an equal protection claim. Without this plank of his argument, his equal protection claim crumbles. The only argument he makes against the rationality of the policies he challenges is that it is arbitrary for defendants to apply the patients' rights statute in a discriminatory manner, thus circling back to his state law argument. Plaintiff has made no attempt to show that the policies of which he complains are not related rationally to the government's interests in maintaining institutional security, preventing escapes and operating a dual-purpose facility on a budget, interests that plaintiff has conceded are legitimate. Accordingly, summary judgment will be granted to defendants on plaintiff's equal protection claims.

## III. PLAINTIFF'S TREATMENT AT THE WISCONSIN RESOURCE CENTER

██ Next, plaintiff contends that defendants are violating his substantive due process right to adequate treatment. In *Youngberg*, the Supreme Court held that under the due process cause of the Fourteenth Amendment, an institutionalized person in state custody "enjoys constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and *such training as may be required by these interests*." *Id.*, 457 U.S. at 324, 102 S.Ct. 2452 (emphasis added). Although defen-

dants point out that in *Youngberg* the Court declined expressly to decide whether mentally retarded patients have "some general constitutional right to training *per se*," *see id.* at 318, 102 S.Ct. 2452, they do not dispute that because one of the purposes for which sexually violent persons are committed under Chapter 980 is to receive treatment, the conditions and duration of plaintiff's confinement must be related reasonably to that purpose. *See id.* at 391 n. 25, 102 S.Ct. 2452 ("A court properly may start with the generalization that there is a right to minimally adequate training. The basic requirement of adequacy ... may be stated as that training which is reasonable in light of identifiable liberty interests and the circumstances of the case."); *State v. Carpenter*, 197 Wis.2d 252, 258, 541 N.W.2d 105 (1995) (concluding that Chapter 980 is "primarily intended to protect the public and to provide concentrated treatment to convicted sexually violent persons, not to punish the sexual offender").

With regard to the nature of treatment, however, the state "enjoy[s] wide latitude in developing treatment regimens [for sex offenders]." *Kansas v. Hendricks*, 521 U.S. 346, 368 n. 4, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). In determining whether the state has met its obligation to provide minimally adequate treatment, "decisions made by the appropriate professional are entitled to a presumption of correctness." *Youngberg*, 457 U.S. at 324, 102 S.Ct. 2452. Thus, as with his challenge to the institution's transportation policy, plaintiff must show that "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323, 102 S.Ct. 2452 (footnote omitted).

Plaintiff contends that since he has begun receiving treatment, the treatment he has received is "grossly inadequate" because it consists only of group therapy sessions that meet twice a week for two to three hours, amounting to barely two percent of his total time at the Wisconsin Resource Center. As proof that this amount of treatment falls below professional standards, plaintiff cites to a sentence from *Hendricks* wherein the Court noted that Hendricks was "receiving in the neighborhood of 31—1/2 hours of treatment per week." *Id.*, 521 U.S. at 368, 117 S.Ct. 2072. However, this comment was dicta: the conditions of Hendricks's confinement, including the type or amount of treatment he was receiving, were not at issue before the Court. It is not plausible for plaintiff to suggest that this isolated comment established a floor as to the number of hours of treatment a state must provide sex offenders in order for its treatment regimen to survive constitutional scrutiny under *Youngberg*. To the contrary, when the Court's comments are read in their proper context, they indicate that something far less than the amount of treatment that Kansas was providing will satisfy *Youngberg*:

> Although the treatment program initially offered Hendricks may have seemed somewhat meager, it must be remembered that he was the first person committed under the Act. That the State did not have all of its treatment procedures in place is thus not surprising. What is significant, however, is that Hendricks was placed under the supervision of the Kansas Department of Health and Social and Rehabilitative Services, housed in a unit segregated from the general prison population and operated not by employees of the Department of Corrections, but by other trained individuals. And, before this Court, Kansas declared "[a]bsolutely"

that persons committed under the Act are now receiving in the neighborhood of "31–1/2 hours of treatment per week." *Id.*, at 367–68, 117 S.Ct. 2072 (citation omitted).

In a footnote to this passage, the Court added:

> We have explained that the States enjoy wide latitude in developing treatment regiments. *Youngberg v. Romeo,* 457 U.S. 307, 317, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (observing that State "has considerable discretion in determining the nature and scope of its responsibilities"). In *Allen v. Illinois,* 478 U.S. 364, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986), for example, we concluded that "the State serves its purpose of treating rather than punishing sexually dangerous persons by committing them to an institution expressly designed to provide psychiatric care and treatment." *Id.*, at 373, 106 S.Ct. 2988 (emphasis deleted). By this measure, Kansas has doubtless satisfied its obligation to provide available treatment.

*Id.*, at 368 n. 4, 117 S.Ct. 2072.

As noted previously, the states enjoy wide latitude in developing treatment regimens. Not only is the Wisconsin Resource Center an institution designed specifically to provide psychiatric care and treatment, but plaintiff is receiving treatment designed specifically to address his sexually violent behavior. Although the modest amount of time devoted to therapy raises questions about the state's commitment to treatment of Chapter 980 patients, plaintiff has presented no evidence in the form of expert testimony or otherwise from which this court could conclude that the amount of treatment plaintiff is receiving is not related reasonably to treating him for his mental condition. Moreover, plaintiff has presented no evidence to suggest that any of the individuals responsible for implementing the sex offender treatment program at the Wisconsin Resource Center lack the professional expertise to make judgments about the number of treatment hours that patients should receive or that they have failed to exercise this judgment in developing or administering the treatment program. Plaintiff cannot expect this court to find that defendants are providing constitutionally inadequate treatment just because he says so. Because plaintiff has failed to adduce any evidence whatsoever to show that defendants failed to exercise their professional judgment with respect to his treatment, summary judgment will be granted to defendants on this claim.

## ORDER

IT IS ORDERED that the motion of plaintiff Richard Thielman for summary judgment is DENIED in its entirety. The motion of defendants Laura Flood, Byran Bartow, Diane Fergot, Jerry Bednarowski, Margaret Alexander, Anna Salter, Jon Litscher, Joseph Leeann and James Doyle is GRANTED in its entirety. The clerk of court is directed to enter judgment in favor of defendants and close this case.