**Ricky J. RAPIER, Plaintiff–Appellant,**

v.

**Sheriff William HARRIS, Jail Commander Jon Marvel, Correctional Officer Ray Higginbotham, et al., Defendants–Appellees.**

No. 97–1348.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 28, 1998.

Decided April 19, 1999.

Jerold S. Solovy, Jenner & Block, Chicago, IL, Ricky J. Rapier, pro se, Indianapolis, IN, for Plaintiff–Appellant.

Robert L. Wright, William W. Earls (argued), Wright, Shagley & Lowery, Terre Haute, IN, for Defendants–Appellees.

Jerold S. Solovy, pro se, Melissa C. Brown (argued), Jenner & Block, Chicago, IL, for Jerold S. Solovy, Amicus Curiae.

Before CUDAHY, EASTERBROOK and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Ricky Joe Rapier brought a § 1983 claim against the Sheriff of Vigo County, Indiana, .various employees of the Vigo County Jail, and a police detective (collectively, "the defendants") for alleged violations of his constitutional rights during his detention at the jail while awaiting trial. He seeks review of the district court's decision to grant summary judgment for the defendants. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

## I

### BACKGROUND

#### A. Facts

On July 19, 1992, Mr. Rapier was arrested by the Terre Haute Police for disorderly conduct, resisting law enforcement, and three counts of battery on a law enforcement officer. He remained at the Vigo County Jail as a pretrial detainee until June 6, 1993. On July 31, 1992, Mr. Rapier was seen taking two food trays for himself, in violation of the Jail Rules. When confronted about this violation, Mr. Rapier became combative and was moved to the "drunk tank." While in the tank, Mr. Rapier yelled obscenities and insults at two jail officers.

On August 4, 1992, Officer Higginbotham and an inmate-trustee placed a food tray for Mr. Rapier on the shelf of the door to the solitary cell where he was being held.[1] Mr. Rapier threw the tray of food and iced tea at the officer and the trustee. When Officer Harvey, the supervising officer, arrived on the scene, Mr. Rapier threw a container of urine at him. Mr. Rapier then flooded his cell by stuffing things in the toilet and was found holding part of a spoon, which inmates are required to return after meals for safety reasons. Mr. Rapier was then moved to another solitary, cell.

On September 25, 1992, Mr. Rapier attacked inmate-trustee Griffin, using a

1. The record does not indicate why Mr. Rapier was being held in a solitary cell at this time, or at what point after he was placed in the drunk tank he was moved to the solitary cell.

weapon fashioned from a broken broom handle. Mr. Rapier stabbed Griffin in the back and face and then chased after him. Griffin required hospital treatment for his injuries. On the same day, Mr. Rapier was placed in solitary confinement. Mr. Rapier was charged with Battery, a class C felony, for his attack on Griffin and pleaded guilty on May 3, 1993.

When Mr. Rapier was placed in solitary confinement after the September 25 attack, he did not receive written notice or a hearing or any other process. His misconduct continued while he was in solitary confinement, resulting in various interdepartmental reports and memoranda, and he remained there for 270 consecutive days. For various periods of time during his segregation, Mr. Rapier's phone and commissary privileges were suspended, he was denied writing materials, he received no access to recreational facilities, he was denied showers and personal hygiene items, and, on three occasions, Mr. Rapier was denied the non-pork meals he requested. In addition, inmate-trustee Griffin was allowed to serve Mr. Rapier his meals. While deprived of various services and supplies while in solitary confinement, he was not deprived of anything necessary for his sustenance.

### B. Holding of the District Court

The district court granted the defendants' motion for summary judgment because it found that Mr. Rapier had not established the deprivation of a right secured by the Constitution or federal law. We shall summarize the court's resolution of the issues relevant to this appeal.

The district court first determined that Mr. Rapier's placement in solitary confinement without notice or a hearing did not violate his due process rights. Although due process entitles a pretrial detainee to be free from punishment prior to an adjudication of guilt, the court explained, a disability imposed during pretrial detention does not constitute impermissible punishment if it is reasonably related to a legitimate government objective and is not imposed with intent to punish. *See* R.76 at 8–9 (citing *Bell v. Wolfish*, 441 U.S. 520, 539, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). The district court found that Mr. Rapier's placement in segregation was not "punishment" but was instead rationally related to the legitimate government objective of maintaining the safety of other inmates and jail personnel. Thus, Mr. Rapier's placement in segregation did not violate due process.

The district court also held that Mr. Rapier's free exercise rights were not violated when he was denied non-pork meals on three occasions out of 810 meals. The court found that the denials did not result from jail policies or regulations but instead resulted from occasional shortages due to limited resources.

The district court, having concluded that Mr. Rapier did not suffer the deprivation of any federally secured right, found it unnecessary to analyze the defendants' claim of qualified immunity.

## II

## DISCUSSION

■ We begin with the fundamental principle that a person held in confinement as a pretrial detainee may not be subjected to any form of punishment for the crime for which he is charged. *See Bell v. Wolfish*, 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).[2] Any other rule would

---

2. We point out in passing that nothing in the Supreme Court's decision in *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), alters this fundamental proposition. In *Sandin*, the Supreme Court held that a prisoner incarcerated as a result of a criminal sentence had no liberty interest in being free from segregated confinement imposed as a disciplinary measure. The Court made clear, however, that the justification for such an approach was grounded in its determination that such discipline "falls within the expected perimeters of the sentence imposed by a court of law." *Id.* at 485, 115

render nugatory the basic proposition that a person is innocent until there is a judicial determination of guilt. *See id.*[3] Nevertheless, a person lawfully detained in pretrial confinement because there is probable cause to believe that he has committed a crime is subject to certain restrictions on his liberty. The government may take measures that are reasonably calculated to effectuate the pretrial detention. *See id.* at 537, 99 S.Ct. 1861. The government also has

> legitimate interests that stem from its need to manage the facility in which the individual is detained. These legitimate operational concerns may require administrative measures that go beyond those that are, strictly speaking, necessary to ensure that the detainee shows up for trial. For example, the Government must be able to take steps to maintain security and order at the institution and make certain no weapons or illicit drugs reach detainees.

*Id.* at 540, 99 S.Ct. 1861. These restraints may at times be "discomforting," but, as long as they are "reasonably related" to the effective management of the confinement facility, they are not considered punishment for the crime that the detainee is suspected to have committed. In deciding whether a particular measure is reasonably related to the function of pretrial confinement, we must be careful, the Supreme Court has admonished, to remember that the implementation of such measures is "peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Bell*, 441 U.S. at 540 n. 23, 99 S.Ct. 1861 (quoting *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 41

S.Ct. 2293; *see also Mitchell v. Dupnik*, 75 F.3d 517, 524 (9th Cir.1996).

**3.** *See also Ingraham v. Wright*, 430 U.S. 651, 671–72 n. 40, 97 S.Ct. 1401, 51 L.Ed.2d 711

L.Ed.2d 495 (1974)) (internal quotation marks omitted).

In addition to the regulatory measures that prison officials may take to ensure the effectiveness of pretrial confinement, a pretrial detainee can be punished for misconduct that occurs while he is awaiting trial in a pretrial confinement status. Notably, the basis for this punishment is not the underlying crime of which he stands accused; rather, this punishment is based upon the detainee's actions while in pretrial confinement. *See Mitchell v. Dupnik*, 75 F.3d 517, 524 (9th Cir.1996); *Collazo–Leon v. United States Bureau of Prisons*, 51 F.3d 315, 318 (1st Cir.1995).

Unlike sentenced prisoners for whom much institutional punishment can be considered to be within the parameters of the imposed sentence of confinement, *see Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), pretrial detainees, serving no sentence and being held only to answer an accusation at trial, have no expectation that, simply by virtue of their status as pretrial detainees, they will be subjected to punishment. Indeed, in *Sandin*, the Supreme Court explicitly stated that "*Bell* correctly noted that a detainee 'may not be punished prior to an adjudication of guilt in accordance with due process of law.'" *Sandin*, 515 U.S. at 484, 115 S.Ct. 2293 (quoting *Bell*, 441 U.S. at 535, 99 S.Ct. 1861). This distinction between convicted prisoners serving a sentence and pretrial confinees has been recognized by the courts of appeals that have addressed this issue. The First and Ninth Circuits have recognized specifically that pretrial detainees may constitutionally be punished for infractions committed while awaiting trial, but also have recognized the need for procedural protections prior to the imposition of any punishment. In *Mitchell v. Dupnik*, 75 F.3d 517 (9th Cir.

(1977); *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963); *Wong Wing v. United States*, 163 U.S. 228, 237, 16 S.Ct. 977, 41 L.Ed. 140 (1896).

1996), the Ninth Circuit held that "pretrial detainees may be subjected to disciplinary segregation only with a due process hearing to determine whether they have in fact violated any rule." *Id.* at 524. The court explained that, in contrast to convicted prisoners, pretrial detainees have no sentence that could be deemed to encompass such disciplinary confinement. *See id.* at 524–25. Moreover, the court noted, "a due process hearing helps to ensure that disciplinary punishment is what it purports to be, rather than punishment in advance of conviction for the crime that led to detention—the evil condemned by *Bell.*" *Id.* at 524 n. 4. More specifically, *Mitchell* held that the prison's blanket policy of forbidding inmates from calling witnesses on their behalf during disciplinary proceedings violated due process. *See id.* at 525.

Similarly, in *Collazo–Leon v. United States Bureau of Prisons*, 51 F.3d 315, 318 (1st Cir.1995), a pretrial detainee was brought before a disciplinary hearing officer on charges of attempted escape and attempted bribery of a prison guard. He was found guilty of the misconduct and was placed in disciplinary segregation. He brought a petition for a writ of habeas corpus alleging violations of his substantive and procedural due process rights. The First Circuit held that punitive restrictions or conditions may constitutionally be placed on pretrial detainees, provided that the restrictions further some legitimate governmental objective (such as addressing a specific institutional violation, ensuring a detainee's presence at trial, or maintaining safety, internal order, and security within the institution) and are not excessive in light of the seriousness of the violation. *See id.* at 318 (citing *Bell,* 441 U.S. at 540, 99 S.Ct. 1861). The court noted that "[t]he administrators of the prison must be free, within appropriate limits, to sanction the prison's pretrial detainees for infractions of reasonable prison regulations that address concerns of safety and security within the detention environment." *Id.* Drawing on *Bell's* admonition that courts should respect the professional

expertise of corrections officials in maintaining security and order in penal institutions, the First Circuit stated in *Collazo–Leon* that *Bell* provided "clear approval of a broad exercise of discretion by prison authorities to take reasonable and necessary action, including punishment, to enforce the prison disciplinary regime and to deter even pretrial detainees from violation of its requirements." *Id.* The court thus held that the Constitution does not prohibit the punishment of pretrial detainees for legitimate institutional purposes, but prohibits only the exercise of disciplinary authority for the purpose of, or with the unintended effect of, punishing the pretrial detainee for the acts for which he is being detained. *See id.* The court thus vacated the district court's grant of habeas corpus on substantive due process grounds and remanded the case to the district court to determine whether the petitioner had received the process that he was constitutionally due.

Although this circuit has not directly decided whether a pretrial detainee has the right to procedural due process in connection with a punishment for disciplinary infractions, we have indicated in dictum in *Whitford v. Boglino*, 63 F.3d 527, 531 n. 4 (7th Cir.1995), that a due process hearing is required.

■ In sum, prison officials have considerable leeway to punish convicted prisoners for misconduct committed while in prison without affording them further procedural protection. The Due Process Clause simply guarantees convicted prisoners the right to be free of punishment that is beyond the normally expected incidents of prison life. *See Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (citing *Vitek v. Jones,* 445 U.S. 480, 493, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980)). However, pretrial confinees are not similarly situated; they are not under a sentence of confinement, and therefore it cannot be said that they ought to expect whatever deprivation can

be considered incident to serving such a sentence. Therefore, as the cases we already have discussed indicate, the *Sandin* analysis will not support punishing a pretrial detainee. Rather, as the circuits that have addressed the matter have indicated, although it is permissible to punish a pretrial detainee for misconduct while in pretrial custody, that punishment can be imposed only after affording the detainee some sort of procedural protection.

■ Because the same conduct may be the basis for either nonpunitive, regulatory restrictions or punitive sanctions, it is often important to distinguish between nonpunitive measures and the punitive measures that are subject to due process restrictions. We cannot accept the suggestion of the amicus, relying on *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), that the distinction between punitive and non-punitive measures ought to depend on whether we can discern in state regulations governing the confinement of pretrial detainees sufficient evidence of the intent of state legislative and regulatory authorities to create a protectable liberty interest. This methodology, grounded in *Hewitt*, has been rejected by the Supreme Court, in *Sandin*, in the context of convicted prisoners and is, we believe, no more valid in the context of pretrial detainees. We are aware that *Sandin* distinguishes between convicted prisoners and pretrial confinees, but we do not believe that the distinction made by the Court, read in context, justifies the continued vitality of the *Hewitt* approach in dealing with pretrial confinees. In *Sandin*, the Supreme Court made the distinction between the convicted prisoners and pretrial confinees while discussing the nature of the liberty interest implicated in a penal sentence of confinement. As we have discussed already, the Court emphasized that punitive restrictions placed on pretrial confinees cannot be justified on the ground that such restrictions are an expected part of their sentence for the simple reason that they are not serving a sentence. This analysis, however, does not suggest the continued vitality of *Hewitt*. Indeed, the same concerns that caused the Supreme Court to reject such an approach in the case of convicted prisoners militate against the use of such a methodology here. In *Sandin*, the Supreme Court rejected the *Hewitt* approach because it had produced "at least two undesirable effects." 515 U.S. at 482, 115 S.Ct. 2293. First, it "creates disincentives for States to codify prison management procedures in the interest of uniform treatment." *Id.* Second, "the *Hewitt* approach has led to the involvement of federal courts in the day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone." *Id.* This latter effect, the Court added, "has run counter to the view expressed in several of our cases that federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment." *Id.*

In our view, a more fruitful methodology for distinguishing between punitive and non-punitive actions against pretrial confinees can be found in *Bell*, the Court's watershed case involving pretrial confinees and a holding left undisturbed by *Sandin*. *Bell* established that a particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose. *See Bell*, 441 U.S. at 538, 99 S.Ct. 1861. Additionally, a restriction or condition may "amount to punishment" if prison officials are "deliberately indifferent" to a substantial risk to the detainee's safety. *See Zarnes v. Rhodes*, 64 F.3d 285, 290 (7th Cir.1995) (holding that inmate's allegation that prison guards had shown deliberate or reckless disregard for her safety by placing her in a cell with a dangerous inmate was sufficient to state a claim under the Due Process Clause). In this context, we

have defined "deliberate indifference" to mean intentional or criminally reckless conduct. See Salazar v. City of Chicago, 940 F.2d 233, 238 (7th Cir.1991). Thus, to violate a pretrial detainee's due process rights, prison officials would have to intend for him to die or to suffer grievously, or they would have to act indifferently to a known risk that he would die or suffer grievously. See id. at 238–39 (noting that any act with a state of mind less than intent or criminal recklessness, such as negligence or gross negligence, does not amount to punishment); see also Tesch v. County of Green Lake, 157 F.3d 465, 474 (7th Cir.1998) (citing cases establishing that a pretrial detainee must show prison officials' deliberate indifference toward the detainee's need for medical care, risk of suicide, risk of harm from other inmates, or need for food and shelter); Brownell v. Figel, 950 F.2d 1285, 1290–91 (7th Cir. 1991) (noting that deliberate indifference to—intentional or reckless disregard for— the serious medical needs of a pretrial detainee amounts to constitutionally impermissible punishment).

 We turn to the record before us. Whether the actions of the defendants constituted punishment for Mr. Rapier's conduct while in confinement—punishment that could be imposed only with the sort of procedural protections contemplated by the decisions of our sister circuits in Mitchell and Collazo–Leon—involves factual questions that might well not be subject to resolution on summary judgment. Even when we resolve any ambiguity in Mr. Rapier's favor, however, we must conclude that the defendants enjoy qualified immunity. As a general rule, government officials performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct.

2727, 73 L.Ed.2d 396 (1982). On the other hand, when the law is clearly established at a level of sufficient specificity, a government official may not rely on qualified immunity.

It does not appear that, at the time the defendants acted, the law was sufficiently clear to apprise them that maintaining Mr. Rapier in segregation throughout the period in question was not sufficiently related to the legitimate governmental objective of maintaining good order and discipline within the detention facility or that it was excessive in light of that objective. Keeping in mind that we must accord the decisions of prison officials in this regard a great deal of latitude, we cannot say that a reasonable person would have considered the decision to segregate Mr. Rapier to be unnecessary. Nor, on this record, is there evidence that the defendant officials should have been aware that their action constituted deliberate indifference to a substantial risk to Mr. Rapier's safety.

 We also believe that, even if the acts of the defendants constituted punishment under Bell, it was not clearly established, at the time the defendants acted, that certain procedural protections must attend any disciplinary measures taken against pretrial detainees. Although Bell had established that a pretrial detainee could not be punished for the underlying offense for which he was being held, the law was not clearly established with respect to the need for additional procedural safeguards when prison officials impose punitive sanctions for misconduct while awaiting trial. Nor was it clearly established how one ought to differentiate between administrative action designed to assure the safe running of the facility and punitive action. Under these circumstances, we believe that the district court's judgment ought to be affirmed on the ground that the defendants are entitled to qualified immunity.[4]

---

4. We also affirm the district court's grant of summary judgment for the defendants on Mr.

Rapier's free exercise claim. Mr. Rapier submits that the jail's denial of his request for a

### Conclusion

For the foregoing reasons, we affirm the district court's grant of summary judgment for the defendants.

AFFIRMED.

pork-free meal on three occasions, out of approximately 810 meals that he received while incarcerated, constituted an impermissible burden on his free exercise of religion.

We cannot accept this argument. De minimis burdens on the free exercise of religion are not of constitutional dimension. *See, e.g., Walsh v. Louisiana High Sch. Athletic Ass'n,* 616 F.2d 152, 158 (5th Cir.1980), *cert. denied,* 449 U.S. 1124, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981); *Windsor Park Baptist Church, Inc. v. Arkansas Activities Ass'n,* 658 F.2d 618, 622–24 (8th Cir.1981). In this case, the unavailability of a non-pork tray for Mr. Rapier at 3 meals out of 810 does not constitute more than a de minimis burden on Mr. Rapier's free exercise of religion. Mr. Rapier has not alleged a routine or blanket practice of denying him pork-free meals. The jail's practice was to accommodate inmates' requests for non-pork meals when possible, and Mr. Rapier has presented no evidence that the absence of non-pork trays on those three occasions was caused by anything other than institutional shortage. Thus, the prison officials' failure to accommodate Mr. Rapier's standing request for non-pork meals on three isolated occasions does not give rise to liability for a constitutional violation. *Cf. Owen v. Shuler,* 466 F.Supp. 5, 7 (N.D.Ind.1977) (holding that de minimis delays in mail delivery are unavoidable in any large institution and do not implicate the Constitution as long as they are not unreasonable), *affirmed mem.,* 594 F.2d 867 (7th Cir.1979).