In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2081

RICHARD THIELMAN,

Plaintiff-Appellant,

v.

JOSEPH LEEAN, LAURA FLOOD, JERRY BEDNAROWSKI,
DIANE FERGOT, MARGARET ALEXANDER, ANNA SALTER,
BYRAN BARTOW, JON LITSCHER, and JAMES DOYLE,

Defendants-Appellees.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 99-C-580-C--Barbara B. Crabb, Chief Judge.

Argued November 2, 2001--Decided March 4, 2002


   Before POSNER, RIPPLE, and EVANS, Circuit
Judges.

   EVANS, Circuit Judge.  A Wisconsin law,
part of what we will call Chapter 980,
defines a sexually violent person as one
"who has been convicted of a sexually
violent offense . . . and who is
dangerous because he or she suffers from
a mental disorder that makes it
substantially probable that the person
will engage in acts of sexual violence."
Wis. Stat. sec. 980.01(7). Among other
brushes with the criminal law, Richard
Thielman was convicted of second degree
sexual assault for an incident involving
a minor boy back in 1987. In 1989
Thielman pled guilty to another charge of
second degree sexual assault (stemming
from an incident preceding his
incarceration on the 1987 conviction),
again involving a minor boy, this time
his son. As Thielman's criminal sentence
neared its completion, the State
initiated proceedings to have him
declared a sexually violent person under
Chapter 980. A court so adjudicated him
and he was "committed to the custody" of
the Department of Health and Family
Services "for control, care and treatment
until such time as [he] is no longer a
sexually violent person." Wis. Stat. sec.
980.06(1). The finding that he was a

sexually violent person was supported, as it must be under the Wisconsin law, by proof beyond a reasonable doubt.

Thielman was assigned to the Wisconsin Resource Center (WRC), a medium-security facility housing persons committed under Chapter 980 along with regular inmates, most of whom have mental problems. Thielman, who is now 63 years old, suffers from numerous health problems. His condition requires that he be transported from the WRC (on an average of three times a month, it would appear) for outside medical treatment. The WRC operates under a policy, developed by the Department of Corrections, which says"Inmates shall be placed in full and double-locked restraints, chain-belt-type waist restraints with attached handcuffs, security Blackbox, and leg restraints." Thielman challenged this policy and a handful of others, but all his claims were dismissed, on the State's motion, by Judge Barbara B. Crabb in the district court. This appeal involves Thielman's claims under 42 U.S.C. sec. 1983 that WRC's transport policy violates his rights to procedural due process and equal protection of the laws under the Fourteenth Amendment. He seeks declaratory and injunctive relief. We review the issues of law de novo.

We note at the outset that since this appeal was filed Thielman has been transferred from the WRC to the Sand Ridge Secure Treatment Center, which now houses all Chapter 980 patients. According to Thielman, the issues before us are "unaffected by this change." The State has not argued that Thielman's transfer moots this appeal, presumably because Thielman is subject to a similar transport policy or perhaps he could be returned to the WRC. Accordingly, we reach the merits.

Thielman first claims that WRC's transport policy violates his right to procedural due process because the State has deprived him of a liberty interest without an individualized determination as to whether he poses a danger or escape risk when he is taken from the facility. The State concedes that no individualized determination is made, so we look to the predicate question of whether Thielman has a liberty interest in not being subjected to WRC's restraint policy.

Shango v. Jurich, 681 F.2d 1091, 1097
(7th Cir. 1982).

Liberty interests can arise from two
sources: the Federal Constitution or
state law. Id. Thielman claims a liberty
interest deriving from state law. In the
district court, Thielman cited sec.
51.61(1)(i)(1) of the Wisconsin Statutes,
a provision of the State Alcohol, Drug
Abuse, Developmental Disabilities and
Mental Health Act dealing with patients'
rights. That section provides mental
patients, including Chapter 980 patients,
with "a right to be free from physical
restraint and isolation except for
emergency situations or when isolation or
restraint is a part of a treatment
program." Wis. Stat. sec. 51.61(1)(i)(1).
Prior to August of last year, that
section also stated: "Patients who are
committed or transferred under s.
51.35(3) or 51.37 or under ch. 971 or 975
may be restrained for security reasons
during transport to or from the
facility." Id. Because this statutory
language fails to mention Chapter 980
patients, Thielman argues that it
requires that he be free from restraints
during transport. Reliance on that
argument took a hit when, while this
appeal was pending, the Wisconsin
Legislature amended sec. 51.61(1)(i)(1)
to include Chapter 980 patients in the
class of patients that could be
restrained during transport to and from
the facility. 2001 Wis. Act 16, sec.
1993r.

The State argues that the amendment
moots Thielman's claim that he has a
state-created liberty interest in not be
ing restrained. Wrong. Even if Thielman's
claim was based on sec. 51.61(1)(i)(1)
alone, the amendment would not eliminate
the "controversy" at issue--whether WRC's
policy violates Thielman's right to
procedural due process. It would just
dictate how that controversy should be
resolved. In light of the amendment, it
is plain that Thielman no longer has a
state-created liberty interest in being
free from restraint during transport.

But Thielman's challenge is not based on
sec. 51.61(1)(i)(1) alone. He also points
to sec. 51.61(1)(e), which provides that
"[e]xcept in the case of a patient who is
admitted or transferred under s. 51.35(3)
or 51.37 or under ch. 971 or 975,"

patients shall have "the right to the least restrictive conditions necessary to achieve the purposes of admission, commitment or protective placement, under programs, services and resources that the county board of supervisors is reasonably able to provide . . . ." He also cites former sec. 980.06(2)(b) of the Wisconsin Statutes, which directs that the Wisconsin Department of Health and Family Services "shall arrange for control, care and treatment of [a sexually violent] person in the least restrictive manner consistent with the requirements of the person and in accordance with the court's commitment order." Section 980.06(2)(b) was repealed in 1999, see 1999 Wis. Act 9, sec. 3223(j), but the repeal did not apply to commitment orders entered prior to October 29, 1999. Thielman was committed in April 1996. He notes that although the Wisconsin Legislature amended sec. 51.61(1)(i)(1), it did not touch sec. 980.06(2)(b) (presumably with respect to those whose its repeal did not affect) nor add Chapter 980 patients to the class of patients exempted from coverage under sec. 51.61(1)(e). Therefore, he still claims a right to the "least restrictive conditions of confinement." He argues that WRC's restraint policy, which mandates leg chains and a waist belt, deprives him of this narrower liberty interest.

Thielman's argument raises questions requiring a look at two Wisconsin statutes, one of which has been repealed and another which was recently amended. In order to determine if sec. 51.61(1)(e) or sec. 980.06(2)(b) provides Thielman with a liberty interest, we would have to analyze whether either section was intended to apply to the transport of patients, a contingency that appears to be covered more directly in sec. 51.61(1)(i)(1). If so, we would then have to consider whether and how the amendment to sec. 51.61(1)(i)(1) did or did not alter the meaning of the other sections. We would navigate this thicket without direct guidance from Wisconsin's appellate courts.

We need not unravel these state statutory mysteries, however, because any inquiry would be much ado about nothing. Federal precedent indicates that, even granting Thielman the premise of his argument that sec.sec. 51.61(1)(e) and

980.06(2)(b) give him a state-created right to the least restrictive conditions of confinement during transport, they do not provide a liberty interest cognizable under the Fourteenth Amendment. In Sandin v. Conner, 515 U.S. 472 (1995), a prisoner claimed that a prison regulation gave him a liberty interest that was infringed when he was sent to segregated confinement for disciplinary reasons. The prison regulation stated that with regard to prison disciplinary proceedings, "[a] finding of guilt shall be made where . . . [t]he charge is supported by substantial evidence." Id. at 477 n.3. The petitioner argued that, in the absence of a finding of substantial evidence, he could not be subjected to disciplinary confinement.

The Court reviewed and reconsidered its earlier cases on state-created liberty interests, in particular Hewitt v. Helms, 459 U.S. 460 (1983). In Hewitt, the Court had held that prison regulations could give rise to liberty interests if the language of the regulation contained "mandatory" language that an incursion of liberty would not occur absent substantive predicates. Id. at 471-72. Sandin refocused the inquiry on the "nature" of the deprivation at issue. 515 U.S. at 483-84. The Court held that a state could not create a liberty interest unless the right provided freedom fromrestraint that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 484. Because the Court would no longer find liberty interests in the "negative implications" of prison regulations, and the confinement in Sandin did not differ materially from the conditions of administrative confinement at the same prison (to which any inmate could be subject), any deprivation the petitioner suffered was not "atypical and significant" in relation to the "ordinary incidents" of his prison life. Id. at 484-86.

Two concerns motivated the Court's holding. First, it was hesitant to find liberty interests in "negative implications" of prison regulations because it did not want to discourage states from writing such regulations, which are designed to curb the discretion of prison officials. Id. at 482.

Thisconcern is not implicated in Thielman's case because he does not claim rights under a prison regulation. He claims a right under a provision in the State Alcohol, Drug Abuse, Developmental Disabilities and Mental Health Act that specifically deals with "Patients Rights" and under a provision in Wisconsin's sexually violent person commitment statute itself. Finding liberty interests in these places does not undermine the State's intent of governing institution officials; it effectuates the State's intent of providing patients with rights.

But this difference is inconsequential. Although we have on occasion wondered what language can create liberty interests after Sandin, see Barichello v. McDonald, 98 F.3d 948, 954-55 (7th Cir. 1996), nothing in Sandin precludes states from supplying language that confers rights. The Supreme Court itself stated: "[W]e recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause." Sandin, 515 U.S. at 483-84. The more relevant question is what "certain circumstances" must exist before language conferring state rights can translate into federal liberty interests./1

Which brings us to the Court's second concern. The approach that Sandin rejected involved federal courts in the "day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone." Id. at 482. In Sandin, the Court sought instead to "afford appropriate deference and flexibility to state officials trying to manage a volatile environment," especially with regard to "the ordinary incidents of prison life." Id. at 482-83. Accordingly, it articulated a minimum standard for recognizing the kind of deprivation that could trigger federal procedural protection.

Again, Thielman's case differs slightly. Just as Sandin dealt with prison regulations, it also dealt with a prison and a prisoner. Although the WRC, in part, houses correctional inmates, it cannot be termed a prison with regard to Chapter 980 patients. The entire premise of Wisconsin's sexually violent person commitment scheme is that a patient is not confined as punishment for his

earlier criminal behavior. Otherwise, the confinement scheme would run afoul of the double jeopardy provision./2 Nonetheless, facilities dealing with those who have been involuntarily committed for sexual disorders are "volatile" environments whose day-to-day operations cannot be managed from on high. Cf. Youngberg v. Romeo, 457 U.S. 307, 321-24 (1982) (extending "professional judgment" standard to substantive due process claim brought by involuntarily committed mental patient and noting that such a presumption was "necessary to enable institutions of this type--often, unfortunately, overcrowded and understaffed--to continue to function"). Moreover, even though Thielman is not formally a prisoner, his confinement has deprived him (legally) of a substantial measure of his physical liberty. Sandin teaches that any person already confined may not nickel and dime his way into a federal claim by citing small, incremental deprivations of physical freedom. Sandin's reasoning applies with equal force to persons confined under Chapter 980./3 In order to state a procedural due process claim deriving from state law, Thielman must identify a right to be free from restraint that imposes atypical and significant hardship in relation to the ordinary incidents of his confinement.

   Although the deprivation at issue is to be measured against the "ordinary incidents" of his civil confinement, as opposed to the conditions of criminal incarceration, cf. Youngberg, 457 U.S. at 321-22 (noting that "[p]ersons who have been involuntarily committed are entitled to more considerate . . . conditions of confinement than criminals whose conditions of confinement are designed to punish"), we need not consider the details of Thielman's daily existence because his deprivation has been sharply focused by the statutory rights at issue and by Thielman's own particular complaints. Because of the amendment to sec. 51.61(1) (i)(1), Thielman no longer can claim that the statute provides him a liberty interest in being free from physical restraint during transport. Rather, he is relegated to a liberty interest in the "least restrictive conditions of confinement," as (we will assume) provided by sec.sec. 51.61(1)(e) and 980.06(2)(b). In practical terms, we

were told during oral argument that Thielman does not object to the use of handcuffs but does not care one bit for the use of a waist belt and leg chains. This is the stuff of nickels and dimes. The added restraints of a waist belt and leg chains are not "atypical" and "significant" hardships in relation to Thielman's confinement, which, without even considering his overall environment, involves the use of handcuffs during transport. This "incremental" deprivation is not one cognizable as a state-created liberty interest in the wake of Sandin./4

Thielman next challenges WRC's restraint policy on equal protection grounds. In his brief, Thielman mounted a Yick Wo challenge--the discriminatory application of a facially neutral statute--to WRC's restraint policy. See Yick Wo v. Hopkins, 118 U.S. 356 (1886). He claimed that sec. 51.61(1) (i)(1) provided both Chapter 51 patients and Chapter 980 patients with the right to be free from restraint during transport. (Chapter 51 of the Wisconsin Statutes details the "standard" method of committing someone involuntarily to a mental hospital.) Because WRC's policy subjected Chapter 980 patients to full restraints, he argued, it illegally discriminated against them. The amendment to sec. 51.61(1)(i)(1) has changed this song's tune in two ways. First, it has codified the distinction between Chapter 51 and Chapter 980 patients with regard to the right to be free from restraint during transport. Accordingly, this portion of Thielman's Yick Wo argument is now just a standard statutory challenge. Second, because sec. 51.61(1)(e) purportedly provides patients a right to the least restrictive conditions of confinement, Thielman's Yick Wo challenge now focuses on WRC's denial of this narrower right.

We deal first with Thielman's statutory argument. Judge Crabb in the district court found that any classification between Chapter 51 patients and Chapter 980 patients did not implicate a suspect class and did not infringe a fundamental right. Thielman has not challenged these rulings. Accordingly, he is relegated to the rational basis test. FCC v. Beach Communications, Inc., 508 U.S. 307, 313 (1993). "A court will not disturb the law as long as it is rationally related to a

legitimate government interest." Scariano v. Justices of the Supreme Court of Ind., 38 F.3d 920, 924 (7th Cir. 1994). The State argues that the dangerousness of Chapter 980 patients warrants their restraint during transport. Although the involuntary commitment of a person under Chapter 51 can be accomplished by showing, among other things, a "substantial probability of physical harm" to the patient or others, Chapter 980 patients have a previous conviction (or acquittal based on their mental condition) to evidence their dangerousness. Moreover, as the State points out, they are subject to indefinite commitment, heightening their desire to escape. Last, it is not unreasonable for the State to believe that a person with a mental disorder of a sexual nature is qualitatively more dangerous than another mental patient who nonetheless threatens danger to himself or others. Accordingly, Wisconsin has a rational basis for drawing distinctions between Chapter 980 and Chapter 51 patients with regard to the use of restraints.

Thielman's reconfigured Yick Wo challenge also fails. The question here, assuming that sec. 51.61(1)(e) or sec. 980.06(2)(b) provides a right to the least restrictive conditions of confinement, is whether the WRC disregarded the right in a discriminatory fashion. This seems like a strange claim in light of the fact that Thielman is challenging WRC's policy, yet there is no evidence in the record that the WRC houses Chapter 51 patients. In other words, the WRC policy does not classify at all between Chapter 51 and Chapter 980 patients./5 Even assuming it did, however, for the reasons we have discussed, the WRC could rationally provide less restrictive restraints to Chapter 51 patients than it provides to Chapter 980 patients. Moreover, Mario Canziani, security director at the WRC, stated in his affidavit that the WRC has referred for prosecution at least six cases of battery by Chapter 980 patients since 1998. Moreover, in 1998 one patient escaped during transport and abducted a child. The fact that the WRC may have violated state law by treating Chapter 980 and Chapter 51 patients differently adds nothing to Thielman's federal equal protection claim. Muckway v. Craft, 789

F.2d 517, 521-23 (7th Cir. 1986) (holding
that a state's failure to enforce its own
law does not give rise to an equal
protection claim unless the state's
action denies a federal right).

   For all these reasons, the district
court was correct to award the appellees
summary judgment on Thielman's due
process and equal protection claims. This
is not to say, however, that a rigid
transportation restraint policy for all
Chapter 980 patients is to be applauded.
It might be better to treat older, more
infirm patients (recall, Thielman is in
his sixties and his medical condition--
apparently he has prostate cancer,
hypertension, heart disease, and some
degenerative disease of his spine and
right knee--is serious) differently. But
the challenged policies are not
unconstitutional, and so the judgment of
the district court is AFFIRMED. The
State's motion to dismiss this appeal as
moot is DENIED.

FOOTNOTES

/1 The district court in this case determined that
Sandin did not apply because Thielman was not
claiming rights under prison regulations. It
cited Morgan v. Rabun, 128 F.3d 694, 699 (8th
Cir. 1997), which did not apply Sandin's "atypi-
cal, significant deprivation" analysis to a
statutory right provided to an insanity acquitee.
As in Morgan, the district court applied Hewitt.
Judge Ripple's dissent favors this approach, but
we fail to see its logic. Like Sandin, Hewitt
involved a prison inmate claiming rights under a
prison regulation. It is unclear why Hewitt
should govern the liberty interest analysis in
the mental health context when it is no longer
good law even on its own facts. Better, we think,
to consider the reasoning of its successor,
Sandin, which we conclude extends to the sort of
involuntary confinement at issue in this case.

   We feel this is the right approach because, for
one thing, it makes good sense. Someone is invol-
untarily committed, generally speaking, because
his mental illness makes him a safety risk to
himself or others. Accordingly, his commitment
entails some form of restraint, and that re-
straint is often significant. The Sandin rule
simply gives state officials some discretion in
determining how much restraint is necessary in a
given situation (here, traveling outside the
confining institution with a sexually violent per-
son) before federal procedural protection is
triggered. Even then, patients have recourse to

state courts when they want to enforce the letter of a state's patients' rights law. For this reason, Judge Ripple's observation that our approach will somehow frustrate the "will of the people as expressed by their legislature" rings hollow.

/2 Confinement occurs pursuant to Chapter 980 only after a convicted sexual offender has served his legislatively defined debt to society for his original sexual crime (or crimes). Wis. Stat. sec. 980.02(2)(ag). It is based on the State's interests in treating the sexually violent person and in protecting the public from acts that a person, deranged in a sexually violent way and not yet rehabilitated, might commit. State v. Carpenter, 541 N.W.2d 105, 112 (Wis. 1995).

/3 Thielman argues that Rapier v. Harris, 172 F.3d 999 (7th Cir. 1999), forecloses this holding. He contends that in Rapier we did not apply Sandin to a pretrial detainee and, by extension, should not apply it to a Chapter 980 patient. Rapier, however, involved a substantive due process claim implicating Bell v. Wolfish, 441 U.S. 520 (1979); it did not deal with the portion of Sandin concerning state-created liberty interests. Nor do we think that the dicta in Whitford v. Bog-lino, 63 F.3d 527, 531 n.4 (7th Cir. 1995), noting that Sandin "may be limited" to prison regulations, forecloses our holding today.

/4 Whether the policy violates sec.sec. 51.61(1)(e) and 980.06(2)(b) is, of course, a matter for the Wisconsin court system to decide.

/5 Thielman has presented an administrative direc-tive issued in 1998 by the Division of Care and Treatment Facilities (DCTF), a part of the DHFS. That directive provides, in accordance with sec. 51.61(1)(i)(1), that patients with "a recent history of physical aggression may be restrained" during transport and that the "least restrictive restraint necessary" should be used. But the directive apparently does not apply to Chapter 980 patients. Thus it could be said that the DHFS has made the purportedly illegal classification. But it is unclear whether any of the appellees are at all connected with policy-making by the DCTF. Given this state of the record, it is difficult to determine when a classification be tween Chapter 51 and Chapter 980 patients was made and by whom.

RIPPLE, Circuit Judge, dissenting. The Supreme Court's opinion in Sandin v. Conner, 515 U.S. 472 (1995), should not control the analysis in this

case. The rule announced in Sandin is limited by its terms and rationale to the prison environment. By contrast, when a patient claims a liberty interest under a patients' rights statute, Hewitt v. Helms, 459 U.S. 460, 469-72 (1983), and not Sandin, sets out the appropriate analysis for determining whether a liberty interest exists. Accord Morgan v. Rabun, 128 F.3d 694, 699 (8th Cir. 1997). Nevertheless, to the extent this court now adopts the Sandin rule in the context of a mental health facility, the provisions of the patients' rights statute should inform the court's analysis of the complained-of hardship in relation to the "ordinary incidents" of life at such a facility. The majority's opinion in no way accounts for the patients' rights statute in this regard, and, consequently, is analytically flawed even on its own terms.

A.

In Sandin, the Supreme Court renounced the Hewitt test in the context of determining whether prison regulations create liberty interests. See Sandin, 515 U.S. at 481-83. This case does not concern prison regulations, however, but a statute conferring rights on patients receiving treatment for mental illness, developmental disabilities, alcoholism or drug dependencies. See Wis. Stat. sec. 51.61(1). The reasons the Supreme Court gave in Sandin for abandoning the Hewitt test to discern the liberty interests of prisoners do not support the abandonment of the Hewitt test in the context of discerning the liberty interests of mental health patients protected by a patients' rights statute. In Sandin, the Court observed that prison regulations were "primarily designed to guide correctional officials in the administration of a prison," and "not designed to confer rights on inmates . . . ." Sandin, 515 U.S. at 481-82. The statute at issue here, by contrast, is intended to confer rights on patients; it is entitled "Patients rights [sic]." Wis. Stat. 51.61. The Court in Sandin also was concerned that the Hewitt approach "creates disincentives for States to codify prison management procedures . . . ." Sandin, 515 U.S. at 482. The application of the Hewitt test to patients' rights statutes would not raise such a concern, because, in the context of a patients' rights statute, the state legislation was intended clearly to create rights.

In Sandin, the Supreme Court was also concerned that the Hewitt test "has led to the involvement of federal courts in the day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone." Id. In the context of a patients' rights bill, however, the people have created rights for patients.

Enforcing those rights may require courts to scrutinize on occasion the practices of a mental health facility. The burden of so doing, however, is offset by the benefit of effectuating the will of the people as expressed by their legislature and by the benefit that patients receive in having those rights enforced. It is hardly a squandering of judicial resources to enforce liberty interests that a state has created so clearly.

Application of the Hewitt test in the context of patients' rights does not raise the same concerns as those raised by its application in the prison environment. In this way, this case is distinct from Rapier v. Harris, 172 F.3d 999 (7th Cir. 1999), in which we rejected the Hewitt methodology in distinguishing between punitive and non-punitive action against pretrial de-tainees because the case implicated the same concerns as Sandin. See id. at 1005. Not only are the concerns that motivated Sandin absent in the context of a patients' rights statute, but the existence of a state statute reflecting the will of the people to create rights for patients militates in favor of a methodology that will take that statute into account.

B.

If the Sandin test is to be applied in this context, however, the court nevertheless must consider the provisions of the patients' rights statute in determining whether the hardship of which the patient complains is "atypical" or "significant" in relation to the "ordinary inci-dents" of life in a mental health facility. Simply put, the provisions of the patients' rights statute should inform the court's analysis of whether the complained-of hardship is atypical or significant when compared to the "ordinary incidents" of life in the mental health facility. In this way, the court's analysis would demon-strate a respectful consideration of the state legislature's determination of how the state's patients ought to be treated.